UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

-------------------------------------------------------

|  |  |  |
| --- | --- | --- |
| | : | |
| EMMA CAMPBELL, and | : | CASE NO. 5:07-CV-579 |
| TONYA GRAVES | : | |
| | : | JUDGE JAMES S. GWIN |
| | : | |
| Plaintiffs, | : | ORDER & OPINION |
| | : | [Resolving Docs. 120, 121, 122 & 141] |
| vs. | : | |
| | : | |
| TRIAD FINANCIAL CORP., | : | |
| BROMBACKER & WILLIAMS | : | |
| ASSOCIATES, INC., and | : | |
| ASHLEY SHELL | : | |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On February 27, 2007, Plaintiffs Campbell and Graves filed a complaint alleging (1)

violations of 42 U.S.C. § 1981; (2) violations of the Fair Debt Collection Act 15 U.S.C. § 1692(d);

(3) violations of the Ohio Consumer Sales Practices Act O.R.C. § 1345; (4) discriminatory credit

practices O.R.C. § 4112; (5) intentional infliction of emotional distress; (6) invasion of privacy; (7)

breach of contract; and (8) defamation *per se*.  [Doc. 1.] On March 26, 2007, Defendant Triad filed

a counter-claim alleging breach of contract [Doc. 16].  On August 20, 2007, Defendant Triad,

Defendants Brombacker & Williams and Ashley Shell, both filed motions for summary judgment

[Doc. 120; 122].  On that same day, Plaintiffs Campbell and Graves filed a motion for summary

judgment with regard to the counter-claim [Doc. 121].  On August 30, 2007, Plaintiffs moved to

amend their complaint to plead diversity jurisdiction.  For the reasons set forth below, the Court

Case No. 5:07-cv-579
Gwin, J.

**GRANTS** in part and **DENIES** in part both Defendants' Motions for Summary Judgment, **DENIES**

Plaintiffs' Motion for Summary Judgment, and **GRANTS** Plaintiffs' motion to file an amended

complaint.

## I.  Background

On June 29, 2005, Plaintiff Tonya Graves purchased a Chevy Classic with an installment

contract from Fred Martin Chevrolet, Inc. [Doc. 1, Ex. 1].  The Retail Installment Sales Contract

listed Plaintiff Graves' mother, Plaintiff Emma Campbell, as the buyer and Plaintiff Graves as the

co-buyer. [*Id.*] To finance the purchase, Plaintiffs borrowed $16,568.80 and agreed to make monthly

payments of $398.49 [*Id.*; Doc. 122, Ex. A].  Fred Martin assigned the installment contract to

Defendant Triad Financial. [Doc. 122, Ex. C].  The contract provided for repossession if Plaintiffs

became delinquent in their payments. [Doc. 1, Ex. 1].

Plaintiff Campbell is Plaintiff Graves' mother.  She signed the contract as a co-buyer. [*Id.*]

In signing the contract, Plaintiff Campbell alleges she intended to sign as a guarantor. [Campbell

Dep. 38].  Defendant Triad cites evidence that it did not require a co-signor, and Plaintiff does not

contradict this evidence. [Thompson Aff.].  The contract states that a co-buyer is responsible for the

full amount on the loan. [Doc. 1, Ex. 1].

Plaintiffs eventually fell behind in their payments. [Doc. 44].  In August and after having

fallen late in making payments on the note, the Plaintiffs requested an additional week to tender

payment. [Campbell Dep. 48-49] Triad denied the request and insisted on payment that day. [Miller

Dep. 37].  Explaining its denial, Triad says it had already given the Plaintiffs a three month grace

period. [Rexroad Aff. 6].  Plaintiffs allege that Defendants then began making repeated and

harassing phone calls to the Plaintiff seeking the overdue payments.  Defendant Triad's employee

Case No. 5:07-cv-579
Gwin, J.

Terri Miller called Plaintiffs at least five times between August 16 and August 31, 2006; Triad employee Crystal Salaam, called Plaintiffs at least ten times during the same two week period. [Miller Dep. 22, 26, 34, 36; Salaam Dep. 22-9, 42, 44, 49-50]. Without contradictory evidence, Defendant Triad says these contacts were made to find out where the vehicle was located to allow a repossession. [*Id.*] Defendant Triad's records reflect an update with an alternative address for the vehicle on August 12, 2006, but the source of the updated potential location of the collateral remains unclear. [Doc. 143, Ex. 12].

Plaintiff Campbell states that on October 26, 2006, she told Defendant Triad's employee Rusty Rexroad the location of the vehicle. [Doc. 121, Ex. 3; Campbell Dep. 204; Graves Dep. 24-25; Doc. 122, Ex. A]. Rexroad denies that Campbell told him this. [Rexroad Aff.]. Plaintiffs allege that the vehicle remained at this address, cleaned out, until Defendants repossessed the car in August of 2007. [Graves Dep. 24].

Defendant Triad obtained the services of two repossession agencies in 2006 but both agencies were unsuccessful. [Rexroad Aff]. In October or November of 2006, a man and a woman came to Plaintiff Campbell's apartment at night and flashed a flashlight in her window [Campbell Dep. 269]. They informed her that they were there to pick up the car, but Plaintiff Campbell informed them the car was at Plaintiff Graves' address. [*Id.*]. Also that fall, a representative from Defendant Triad called Campbell and stated that he was calling from the sheriff's office and where he was going to file a complaint in connection with the fraud that she had perpetrated regarding the vehicle. [Campbell Dep. 275-77]. Triad denies that Snow works for them and states an employee misrepresenting their name is grounds for dismissal. [Brooks Aff. 2]. In late 2006, a Triad employee, Carl Rexroad, telephoned Plaintiff Graves, and Graves states that he called her "despicable" and

Case No. 5:07-cv-579
Gwin, J.

stated that what she was doing to her mother was a shame. [Graves Dep. 26-27].  Rexroad denies

saying those things to Graves. [Rexroad Aff.]

In January 2007, Defendant Triad engaged Defendant Brombacker & Williams to locate the

vehicle for repossession. [Doc. 122, Ex. C].  Thereafter, Defendant Triad alleges that it had no

contact with Plaintiffs except the receipt of Plaintiffs' cease and desist letters. [Doc. 122].

Defendant Brombacker & Williams is a skip tracing company which locates motor vehicles

for clients who have a security interest in those vehicles so that their clients can repossess them.

[Brombacker Aff.].  Defendant Brombacker & William makes "skip trace" telephone calls to the

purchasers of the vehicle or others who may know where the vehicle is located. [*Id.*].

Brombacker & William employed Defendant Shell during relevant times. [Shell Aff.]

Between January 2, 2007 and February 6, 2007, Defendant Shell made several calls to try to locate

the vehicle. [*Id.*].  Defendant Shell called numerous times in a day. [Campbell Dep. 82-92].

Plaintiffs allege the calls would start in the afternoon, and continue throughout the rest of the

business day.  Defendant Shell called numerous times in a day. [Campbell Dep. 82-92].  Plaintiffs

further alleges that Defendant Shell would call the emergency telephone number at both of their

workplaces. [Cambell Dep. 115; Savage Aff].  Plaintiff Campbell alleges on February 6, 2007,

Defendant Shell called her eight times at work, six times within a seven minute period. [Campbell

Dep. 89].  Defendants continued to call, using different names and sometimes representing

themselves an investigator. [Def. Shell Dep. 10, 109].  On one call, Defendants even pretended to

be opening a credit card in order to garner more information. [Graves Dep. 43; Campbell Dep. 57;

Brombacker Dep. 76-77].

Defendants Brombacker & Williams and Shell called Plaintiffs' friends and family to locate

-4-

Case No. 5:07-cv-579
Gwin, J.

the car and in those calls allegedly accused Plaintiffs of fraud and concealment. Plaintiffs allege that

Defendant Shell called Campbell's sister at her place of employment stating Campbell had

committed "fraud and concealment" regarding her car. [Cook-Jordan Dep. 7; Meadows Dep. 8-9].

Plaintiffs also allege that Defendant Shell also told Plaintiff Campbell's co-worker that Plaintiff

Campbell had committed fraud and concealment. [Doc. 121]. Defendant Shell denies this. [Shell

Aff.]. Further, Plaintiffs allege that Defendant Shell called Plaintiff Campbell's mother four times

in one day and told her that she was going to have Plaintiffs put in jail for fraud. [Webster Dep. 5,

7]. Defendant Shell admits to telling Plaintiff Campbell's mother that Campbell was concealing the

collateral vehicle but denies saying anything about fraud. [Doc. 143, Ex. 16].

On January 9, 2007, Plaintiffs sent Defendant Triad a cease and desist letter, and Defendant

Triad forwarded the letter to Defendant Brombacker & Williams. [Doc. 143, Ex. 3]. The letter

requested Defendant Triad and its associates stop calling Plaintiffs at work and stop calling

Plaintiffs' family members. [Doc. 143, Ex. 2]. Defendant Triad's employee emailed Defendant

Brombacker & Williams to continue with their recovery efforts. [Doc. 144, Ex. 4]. Defendants

continued to call Plaintiffs repeatedly, seeking to learn the location of the vehicle collateral. [Graves

Dep. 110; Campbell Dep. 63; Meadows Dep. 7].

Defendant Shell alleges that Plaintiff Campbell asked her to contact her lawyer on February

6, 2007. [Campbell Dep. 103; Shell Dep. 217]. Defendant Shell states that she did so, and

Campbell's lawyer told her to stop calling Campbell. [*Id.*]. Plaintiffs contend that Shell continued

making calls. [Shell Dep. 219].

Plaintiffs allege that Defendant Shell spoke in a "ghetto tone" and was racially inappropriate.

[Campbell Dep. 96; Graves Dep. 8]. Plaintiff Graves states that she felt belittled when Defendant

Case No. 5:07-cv-579
Gwin, J.

Shell spoke "ghetto" to her and that she believes Defendant Shell would not have spoken to her in that manner if she was Caucasian. [*Id.*].  Defendant Shell also allegedly spoke in a slang tone with Plaintiff Campbell and told her that she should "handle her business." [*Id.*].  Defendant did not use any racial epithets. [Graves Dep. 81; Campbell Dep. 119].

Plaintiffs allege they suffered greatly from these calls.  Plaintiff Campbell alleges she sometimes missed work due to the calls. [Campbell Dep. 132, 139].  She also alleges she took sick days off from work because of her headaches, nervousness, and digestive problems, all stemming from these calls. [*Id*].  Plaintiff Campbell alleges she was hospitalized on September 18, 2006 due to the stress that Defendants placed on her, but she also testified that she could not remember why she was hospitalized. [Campbell Dep. 132-33]  In contrast to her claim that Defendants' contacts caused her hospitalization, the hospital records reflect that she was hospitalized in part for moderate to severe alcohol abuse in connection with marital problems. [Campbell Dep., Ex. 6].  Further, she alleges she was unable to sleep due to anxiety, and she took Celexa, Ambien, and Lexapro for her anxiety and emotional distress. [*Id.*].

## II.  Legal Standard

*A. Amend the Complaint*

After a defendant files a responsive pleading, a plaintiff may only amend his complaint by leave of the court.  Fed. R. Civ. P. 15(a).  A court should freely give leave to amend "when justice so requires."  *Id.*  The Supreme Court has articulated the general standard for Rule 15(a):

> In the absence of any declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should,

Case No. 5:07-cv-579
Gwin, J.

as the rules require, be freely given.

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  A court must examine the *Foman* factors in light of the directive of Rule 1 of the Federal Rules of Civil Procedure that the rules "are to be construed to secure the just, speedy, and inexpensive determination of every action."  Fed. R. Civ. P. 1; *Foman*, 371 U.S. at 182.  The decision whether "justice so requires" the amendment is at the district court's sound discretion.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971).

*B.  Summary Judgment*

Summary judgment is appropriate where the evidence submitted shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case.  *Waters v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).  A fact is material if its resolution will affect the outcome of the lawsuit.  *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party meets its burden by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  However, the moving party is under no "express or implied" duty to "support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party satisfies its burden, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

-7-

Case No. 5:07-cv-579
Gwin, J.

U.S. 574, 585-86 (1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt as to the material facts.  *Id.* at 586.  Nor can the nonmoving party "rest upon the mere allegations or denials of the adverse party's pleading."  FED. R. CIV. P. 56(e).

In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party.  *National Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial."  *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)); *see also Celotex*, 477 U.S. at 322.  Ultimately the Court must decide "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Terry Barr Sales Agency, Inc. v. All-Lock Co.*, 96 F.3d 174, 178 (6th Cir. 1996) (internal quotations omitted).

### III.  Analysis

*I. Plaintiffs' motion to Amend the Complaint*

Plaintiffs request the Court to grant leave to amend the complaint to plead diversity jurisdiction now that the parties had agreed to dismiss Defendant Fred Martin Chevrolet, the non-diverse party.  The Court finds that allowing the plaintiff to plead diversity jurisdiction will further the goal of a just and speedy determination in this case.  The parties have conducted their discovery in this Court and are fully diverse.  There is no reason to dismiss the state law claims only for the Plaintiffs to file here a second time.  The Court therefore grants Plaintiffs' motion to amend the complaint.

-8-

Case No. 5:07-cv-579
Gwin, J.

*II. Defendants' Motion for Summary Judgment*

The Court finds there is a genuine issue of material fact on count six: invasion into privacy on an intrusion into seclusion theory as against both defendants, and count eight: defamation *per se* as against Defendants Brombacker & Williams and Shell.   On all other claims, the Court grants the defendants motions for summary judgment.  The Court will discuss each count as alleged by the Plaintiffs in the order as stated in their complaint, except as to the claims arising out of Fair Debt Collection Act–the Court considers those claims altogether.  Where necessary, the Court will discuss the claims against the Defendants separately, first considering the claim as against Defendant Triad and then turning to Defendants Brombacker & Williams and Shell.

**Count One – 42 U.S.C. § 1981**

Plaintiffs allege that Defendants intentionally discriminated against them in the making or enjoyment of a contract.  To establish a prima facie case, Plaintiffs must prove:

> (1) plaintiff is a member of a protected class; (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and; (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001).

The Court finds that neither Defendant Triad, Defendant Brombacker & Williams, nor Defendant Shell treated Plaintiffs in a "markedly hostile manner."  As such, the Court finds Defendants are entitled to summary judgment.

*A. Defendant Triad*

Defendant Triad alleges that Plaintiffs cannot show that they received services in a

Case No. 5:07-cv-579
Gwin, J.

"markedly hostile manner."  The Court agrees.  Plaintiffs allege that Defendant Triad denied

Plaintiffs their to enjoyment of contract when Defendant Triad refused Plaintiffs request for an

additional week to tender payment to reduce the amount owed on the installment contract.  Instead,

Defendant Triad insisted on payment "that day."  (Miller Depo. 37; Graves Depo. 26).

Insisting on immediate payment as due under the parties agreement, without more, is neither

"a manner in which a reasonable person would find objectively discriminatory" nor a "markedly

hostile manner."  Plaintiffs allege no other facts arising out of this incident.  Defendant had already

allowed a three-month grace period. [Rexroad Aff. 6] The Court finds Defendant's exercise of this

right was not objectively discriminatory, and, without more evidence, the Court cannot find a dispute

as to whether Defendant Triad refused the extension of the grace period in a markedly hostile

manner.

Plaintiffs also allege that Defendant Shell's conduct should be attributed to Defendant Triad

despite Brombacker & William being her employer, and that Defendant Shell treated Plaintiffs in

a markedly hostile manner.  The Court finds below that the allegations do not rise to the level of a

markedly hostile manner. *See infra.* For that reason, the Court does not consider Defendant Triad's

liability for Shell's actions under section 1981.

*B. Defendants Brombacker & Williams and Shell*

Defendants Brombacker & Williams and Shell argue that since there was no contractual

relationship or potential for one between it and Plaintiffs, they are entitled to summary judgment on

the Section 1981 claim.  They further argue that the plaintiff did not receive services in a markedly

hostile manner or one that a reasonable person would find objectively discriminatory.

Section 1981 proscribes third party discriminatory interference with the enjoyment of

-10-

Case No. 5:07-cv-579
Gwin, J.

contracts, as alleged here.  *See, e.g., Vakharia v Swedish Covenant Hosp.,* 765 F. Supp 461 (N.D. Ill. 1991) (holding hospital liable under section 1981 for interfering with the formation of contracts between an anaesthesiologist and prospective patients); *Kolb v. State of Ohio, Dep't of Mental Retardation and Developmental Disabilities*, 721 F. Supp. 885, 891-92 (N.D. Ohio 1989) (finding defendant employer immune from suit, but holding the decision-maker personally liable for the discrimination of the employer despite the lack of contract between the plaintiff and the decision-maker); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 518 F. Supp. 993, 1008 (S.D. Tex. 1981) (permitting a Section 1981 claim where plaintiffs complained of defendants' threats and intimidation, which interfered with their ability to make commercial arrangements with dock owners and thereby engage in the commercial fishing business).  For purposes of this analysis only, the Court assumes the alleged interference prevented the Plaintiffs from enjoying their rights under the contract to be treated reasonably during the repossession process, as Plaintiffs do not contest that Defendant Triad was entitled to repossession.

Nevertheless, Defendants Brombacker & Williams and Shell are entitled to summary judgment because they did not treat Plaintiffs in a "markedly hostile manner."  A "plaintiff asserting a § 1981 claim must prove intentional discrimination."  *Christian v. Wal-Mart Stores, Inc.* 252 F.3d 862, 870 (6th Cir. 2001), citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982).  In *Christian*, the Sixth Circuit described the showing that must be made to establish discriminatory intent through a prima facie § 1981 case in a commercial services case.  The Sixth Circuit found  that plaintiffs need show that they were "deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would

Case No. 5:07-cv-579
Gwin, J.

find objectively discriminatory." *Id.* Plaintiffs show no evidence that similarly situated persons outside the protected class were treated better. Failing to show disparate treatment of Whites to establish a discriminatory intent, the Plaintiffs need show treatment in a markedly hostile manner that a reasonable person would find objectively unreasonable.

Inherently, the treatment of customers in the service field is hugely influenced by the context. Discussing this same issue of fathoming whether treatment was motivated by a discriminatory intent, the Second Circuit described the factors to be considered in deciding whether treatment was motivated by a discriminatory intent: were the employees' actions "(1) so profoundly contrary to the manifest financial interests of the merchant and/or her employees; (2) so far outside of widely-accepted business norms; and (3) so arbitrary on [their] face, that the conduct supports a rational inference of discrimination." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 102 (2d Cir. 2001).

In deciding whether Plaintiffs offer sufficient evidence that they received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory, the Court need consider Defendants actions and the context of those actions. In May 2006, Plaintiff Graves defaulted upon a note secured by a lien on the Chevrolet Malibu. Despite her default, she did not return the Malibu. Although Graves claims that she identified the location of the vehicle in October 2006, she necessarily knew that Defendant either did not receive the notification of the vehicle's location or did not understand the notice. Noone picked the collateral up and with the collateral declining in value each day, noone would fail to pick up the collateral had they understood where it was.

In January 2007, Defendants Brombacker & Williams and Shell called Graves and asked for the location of the vehicle. In a large number of conversations, Graves refuses to provide Shell with

-12-

Case No. 5:07-cv-579
Gwin, J.

the location of the Malibu.  For example in a conversation on January 29, 2007, at 1:11 PM, Shell asked Graves "where is the car?"  Graves refuses to give the location of the car and hangs up.  At 1:12 PM, Shell calls again and again asks "where's the car?"  Graves hangs up.  Shell calls again at 1:13 PM once again asking "where's the car?"  Again, Graves does not answer Shell's request for the location of the collateral vehicle.  After Graves refuses to give Shell the location of the collateral, Shell continues to call.

With these calls, the Plaintiffs allege that Defendant Shell used racial undertones and slang in her attempts to locate the car.  Although Plaintiff do not allege that Shell used any racial epithets, they say that Shell spoke in a "ghetto tone" and was "talking like she was black" which included saying "handle your business" "the way [black people] say it." [Campbell Dep. 96; Graves Dep. 81]. Repeating, Defendant Shell used no racial epithets. [Graves Dep. 81, Campbell Dep. 119]. Tellingly, Defendant Ashley Shell is African-American.  Plaintiffs thus say that Defendant Shell, an African-American, acted in a markedly hostile manner by "talking like she was black", which, of course, she is.

If true, the conduct alleged, does not rise to the level of "markedly hostile." *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 102 (2d Cir. 2001) ("We can envision many circumstances where markedly hostile treatment, even in a purportedly service-oriented industry, would raise no inference of racial animus, but rather it would simply be yet another example of the decline of civility."); *see also Miller v. Freedom Waffles, Inc.*, 3:06:-cv-13217, 2007 U.S. Dist. LEXIS 13217, * 12 (W.D. Ky. Feb. 23, 2007)(noting many district courts have found that "serious examples of racially charged conduct -- usually including racial epithets -- are required to establish a prima facie case under *Christian*.")  First, it is nowhere clear what it means to use a "ghetto tone" or to speak "like she was

-13-

Case No. 5:07-cv-579
Gwin, J.

black."  Second, the alleged treatment is not sufficiently markedly hostile, or something a reasonable

person would find objectively discriminatory. *See Christian*, 252 F.3d at 872.  With regard to Shell's

calls, all evidence suggest that she was simply trying to find the location of the Malibu.  Despite

repeated calls, messages and requests, Plaintiff would not give respond to Shell as to the location

of the vehicle.  In this factual setting, no reasonable juror could find Defendant Shell's conduct to

be sufficiently hostile.

The Court, therefore, grants summary judgment to all Defendants on Count One of the

Complaint.

**Counts II, IX, X: Fair Debt Collection Act**

The FDCPA seeks to "eliminate abusive debt collection practices by debt collectors, to

insure that those debt collectors who refrain from using abusive debt collection practices are not

competitively disadvantaged, and to promote consistent State action to protect consumers against

debt collection abuses." 15 U.S.C. § 1692(e).  To be liable under the Act, Defendants must be within

the FDCPA's definition of "debt collectors."

Section 1692a(6) defines a "debt collector" as:

> any person who uses any instrumentality of interstate commerce or the mails in any
> business the principal purpose of which is the collection of any debts, or who
> regularly collects or attempts to collect, directly or indirectly, debts owed or due or
> asserted to be owed or due another. Notwithstanding the exclusion provided by
> clause (F) of the last sentence of this paragraph, the term includes any creditor who,
> in the process of collecting his own debts, uses any name other than his own which
> would indicate that a third person is collecting or attempting to collect such debts.

15 U.S.C. § 1692a(6)    "The Plaintiffs in a FDCPA action bears the burden of proving the defendant's

debt collector status." *Goldstein v. Hutton, Ingram, Yusek, Gainen, Carroll & Bertolotti*, 374 F.3d

56, 60 (2d Cir. 2004).

-14-

Case No. 5:07-cv-579
Gwin, J.

Plaintiffs allege that Defendants have violated portions of Title 15 of the United States Code, the Fair Debt Collection Practices Act (FDCPA), including sections 1692c, 1692d, and 1692e. [Doc. 44].  The Court finds, however, that none of the Defendants in this case fit the definition of "debt collector."  Defendants are therefore entitled so summary judgment on the FDCPA claims.

*A. Defendant Triad*

Defendant Triad argues it is not a debt collector under the act because it is a creditor.  Under the FDCPA, a creditor is not liable under the Act.  *See Wadlington v. Credit Acceptance Corp.*, 76 F.3d 103, 106 (quoting *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1208 (5th Cir. 1985) (citing the legislative history of the statute).  A creditor "means any person who offers or extends credit creating a debt or to whom a debt is owed, but such term does not include any person to the extent that he receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such debt for another." § 1692a(4).  The Sixth Circuit has concluded that a company assigned a loan by a car dealership, at a point in time in which it was not in default, was a creditor and not a debt collector. *Wadlington*, 76 F.3d at 106-107.

Plaintiffs do not respond to the argument that Defendant Triad is a creditor, but they do cite evidence that an employee of Defendant Triad may have used an assumed name and called while he was at the local sheriff's office.  Creditors who use names other than their own–such as a third-party name–to collect on their own debts qualify as debt collectors under the Act. [Campbell Dep. 275-77]. *See* 15 U.S.C. § 1692a(6) ("Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts.")

-15-

Case No. 5:07-cv-579
Gwin, J.

To avoid FDCPA coverage, a creditor should use the "name under which it usually transacts business, or a commonly-used acronym," or "any name that it has used from the inception of the credit relation." *Maguire v. Citicorp Retail Servs.,* 147 F.3d 232, 235 (2nd Cir. 1998) *citing* Federal Trade Commission Statements of General Policy or Interpretation Staff Commentary On the Fair Debt Collection Practices Act, 53 Fed. Reg. 50097, 50107 (1988); *Dickenson v Townside T.V. & Appliance, Inc.*, 770 F. Supp. 1122, 1128 (S.D.W.Va. 1990). "The triggering of the FDCPA does not depend on whether a third party is in fact involved in the collection of a debt, but rather whether a least sophisticated consumer would have the false impression that a third party was collecting the debt." *Maguire*, 147 F.3d at 236.

The Court, therefore, finds Triad is a creditor under the FDCPA and is entitled to summary judgment on the FDCPA claims.

*B. Defendants Bromback & Williams and Shell*

B&W is a skip-tracing agency. [Brombacker Aff.]. Its purpose is to "locate personal property for its clients." *Id.* As skip tracers merely locate property and do not collect debts, they are not debt collectors within the meaning of the FDCPA. *See, e.g.*, *Goldstein v. Chrysler Fin. Co.*, 276 F. Supp.2d 678, 690 (E.D. Mich. 2003).

Nonetheless, Plaintiffs claims that Defendant Brombacker & Williams regularly engage in debt collection and, thus, are debt collectors within the meaning of the statute. *See Heintz v. Jenkins*, 514 U.S. 291 (1995). To show Defendant Brombacker & Williams is a debt collector, Plaintiffs must show Defendant collects debt as a substantial part of its business. *Shroyer v. Frankel*, 197 F.3d 1170, 1176 (6th Cir. 1999).

Plaintiffs allege in their response to Defendants' summary judgment motion that Defendant

Case No. 5:07-cv-579
Gwin, J.

Shell called and asked Plaintiffs to pay their bills and asked about the loan, and Defendant Brombacker & Williams gave its employees bonuses for securing either repossession or payments of the debtor loans.  [Doc. 144] Plaintiffs cite nothing in the record to demonstrate that Defendant Shell asked Plaintiffs to pay their bills.  According to Brombacker's deposition, Brombacker & Williams awards commissions for each account successfully concluded, such as when a vehicle is repossessed.  [Doc. 143, Ex. 13].  That does not show that she, her company (Brombacker & Williams), or her employees repossess vehicles or collect debt. [*Id.*]  Rather, they receive a commission for successfully locating vehicles, or otherwise closing the accounts.  This seems in keeping with typical skip-tracing activity, and does not transform the agency into debt collectors.

Further, even if Brombacker & Williams repossessed vehicles that would only make them debt collectors for the purpose of § 1692f(6). *See Montgomery v. Huntington Bank,* 346 F.3d 693, 699-700 (6th Cir. 2003)(citing *Jordan v. Kent Recovery Serv., Inc.*, 731 F. Supp. 652, 656 (D. Del. 1990).  That section governs repossessing or threatening repossession when there is no present right to possession, intention to take possession, or the property is exempt from repossession.  Here, Triad had a present right to possession and an intention of taking possession.  Thus, at the very least, Defendant Brombacker & Williams are not debt collectors for the purpose of the alleged violations in this case.

Because Brombacker & Williams is not a debt collector, its employee, Defendant Shell, cannot, acting within her capacity as an employee, be a debt collector.  Since neither Brombacker & Williams nor Shell is a debt collector, they are entitled to summary judgment as to Plaintiffs' second, ninth and tenth causes of action related to the FDCPA.

**Count III: Ohio Consumer Practices Act**

-17-

Case No. 5:07-cv-579
Gwin, J.

The Ohio Revised Code § 1345.03 provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." OHIO REV. CODE ANN. § 1345.03(A) (LexisNexis 2007).  The code defines a consumer transaction as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." § 1345.01(A).  A supplier is "a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting consumer transactions, whether or not the person deals directly with the consumer."  ORC § 1345.01(C).

Defendants cite a Sixth Circuit case, interpreting the OCSPA that held:

[w]hile the definition of "supplier" under the OCSPA is substantially broader than the definition of "debt collector" under the FDCPA, the requirements of the statutes are similar  . . . Thus, to determine whether Defendants are "suppliers" under the OCSPA, this Court must ask essentially the same question that it must ask to determine whether Defendants are "debt collectors" under the FDCPA: Did debt collection activities fall within Defendants' regular and usual course of business so that they were "engaged in the business of" debt collection?

*Schroyer v. Frankel*, 197 F.3d 1170, 1177 (6th Cir. 1999).

Based upon the reasoning and factual background discussed in relation to Plaintiffs claims under the FDCPA, the Court finds that no Defendant fits the definition of "supplier."  As such, all Defendants are entitled to summary judgment on plaintiffs claim under O.R.C. § 1345.

*A. Defendant Triad*

Triad argues it is not a supplier.  The Court agrees.  This case seems indistinguishable from *Martin v. General Motors Acceptance Corp.* 160 Ohio App. 3d 19 (Ohio App. 7th Dist. 2005).  In

-18-

Case No. 5:07-cv-579
Gwin, J.

*Martin*, the court found that a secured lender was not the seller of the car, and the OCSPA did not apply to it. *Id.* at 28; *see also Jenkins v. Hyundai Motor Financing Co.*, 389 F.Supp.2d 961, 970 (S.D. Ohio 2005). Fred Martin assigned the Installment Contract to Triad. (Doc. 1, Ex.1). Defendant Triad did not service the Installment Contract nor collect debt on Fred Martin's behalf. (Raposo Aff., ¶ 2.) Consequently, as an assignee of the Contract, Triad is not a "supplier" pursuant to the OCSPA and cannot be held liable under the OCSPA. The Court therefore grants summary judgment to Defendant Triad on Count III.

*B. Defendants Bromback & Williams and Shell*

Defendants Brombacker & Williams and Shell argue that they are not in the business of "effecting or soliciting consumer transactions." The Court agrees. Defendants show that they are skip tracers, in the business of locating cars that were the subject of consumer transactions. [Brombacker Aff.]. Locating a car for repossession is not "effecting . . . [the] consumer transaction."

Even if Brombacker & Williams was a supplier within the meaning of the OCSPA, the Plaintiffs would not be entitled to recovery. The OCSPA prohibits unconscionable sales practices, which include:

(B) In determining whether an act or practice is unconscionable, the following circumstances shall be taken into consideration:

(1) Whether the supplier has knowingly taken advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of an agreement;

(2) Whether the supplier knew at the time the consumer transaction was entered into that the price was substantially in excess of the price at which similar property or services were readily obtainable in similar consumer transactions by like consumers;

-19-

Case No. 5:07-cv-579
Gwin, J.

   (3) Whether the supplier knew at the time the consumer transaction was entered into of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction;

   (4) Whether the supplier knew at the time the consumer transaction was entered into that there was no reasonable probability of payment of the obligation in full by the consumer;

   (5) Whether the supplier required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier;

   (6) Whether the supplier knowingly made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment;

   (7) Whether the supplier has, without justification, refused to make a refund in cash or by check for a returned item that was purchased with cash or by check, unless the supplier had conspicuously posted in the establishment at the time of the sale a sign stating the supplier's refund policy.

ORC § 1345.03(B).    The Plaintiffs have not stated that the Defendant Brombacker & Williams took any actions of the nature prohibited by this section. Defendants Brombacker & Williams were not involved in the sale of the car and never collected any money from the Plaintiffs. Because Defendants Brombacker & Williams and Shell are not suppliers under OCSPA, they could not violate the OCSPA and are entitled to summary judgment under Plaintiffs' third cause of action.

**Count IV: Unlawful Discriminatory Practices in Credit Transactions**

   The Court finds that Plaintiffs have not set forth facts or law that would allege that Defendant Triad engaged in discriminatory practices.  Further, Defendants Brombacker & Williams and Shell are not "creditors" within the definition of O.R.C. § 4112.021.

*A. Defendant Triad*

   O.R.C. § 4112.021 prohibits a creditor from discriminating against a person, by refusing credit or by imposing terms and conditions on the basis of race, color, religion, age, sex, marital

-20-

Case No. 5:07-cv-579
Gwin, J.

status, national origin, disability or ancestry.

Plaintiffs do not allege in their complaint that Defendant Triad discriminated against Plaintiff Graves when it required a co-signor, treated Plaintiff Campbell as the primary on the loan, or required Plaintiffs to bring their account current with a payment that Defendants allegedly knew Plaintiffs could not afford. Plaintiffs merely state these actions discriminated against them in their response to Defendant Triad's motion for summary judgment. [Doc. 143]. Plaintiff cites no case law or relevant facts to support their contention that these actions were discriminatory.

Defendant Triad cites evidence that it did *not* require a co-signor. [Thompson Aff.]. Plaintiffs do not cite evidence to demonstrate this is an issue of fact unresolved between the parties. Plaintiff Campbell stated she believed that it was a mistake that she had signed the contract as a co-buyer. [Campbell Dep. 36-38]. The contract that Plaintiff Campbell signed, however, listed her a co-buyer. [Doc. 143, Ex. 1] The contract defined co-buyer as a person responsible for the entire debt. [*Id.*] That definition appeared directly above Plaintiffs' signatures. Finally, Plaintiffs fail to allege any facts or cite any law that illustrates how these actions constituted discrimination. For this reason, the Court grants summary judgment to Defendant Triad on this claim.

*B. Defendants Brombacker & Williams and Shell*

Defendants Brombacker & Williams and Shell allege they are not a "creditor" or "credit reporting agency" within the meaning of O.R.C. § 4112.021. The statute states:

> (2) "Creditor" means any person who regularly extends, renews, or continues credit, any person who regularly arranges for the extension, renewal, or continuation of credit, or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit, whether or not any interest or finance charge is required.

> (3) "Credit reporting agency" means any person who, for monetary fees or dues or

-21-

Case No. 5:07-cv-579
Gwin, J.

> on a cooperative nonprofit basis, regularly assembles or evaluates credit information
> for the purpose of furnishing credit reports to creditors.

*Id.* Plaintiffs do not allege Defendants Brombackerer & Williams or Defendant Shell are creditors or reporting agencies within the meaning of the statute. Further, they did not respond to Defendants motion for summary judgment on this count.  As such, the Court finds there is no genuine issue of material fact to show a triable issue regarding this claim.  The Court grants summary judgment to Defendants Brombacker & Williams and Shell on Count IV.

**Count V: Intentional Infliction of Emotional Distress**

In order to recover on a claim of intentional infliction of emotional distress, Plaintiffs must prove four elements.

> (1) that the actor either intended to cause emotional distress or knew or should have
> known that actions taken would result in serious emotional distress to the plaintiff,
> (2) that the actor's conduct was so extreme and outrageous as to go "beyond all
> possible bounds of decency" and was such that it can be considered as "utterly
> intolerable in a civilized community," (3) that the actor's actions were the proximate
> cause of plaintiff's psychic injury, and (4) that the mental anguish suffered by
> plaintiff is serious and of a nature that "no reasonable man could be expected to
> endure it."

*Roelen v. Akron Beacon Journal*, 199 F. Supp.2d 685, 696 (N.D. Ohio 2002), quoting *Pyle v. Pyle*, 11 Ohio App. 3d 31, 34, (1983). Conduct that is merely cruel or insensitive does not rise to the level of extreme and outrageous conduct to state a claim for intentional infliction of emotional distress. *Roelen*, 199 F. Supp.2d at 696.

Absent contemporaneous physical injury, compensable emotional distress must be severe and disabling. *See Paugh v. Hanks*, 6 Ohio St. 3d 72, paragraph three of the syllabus (1983). Plaintiffs claiming severe and debilitating emotional injury must present some guarantee of genuineness in support of their claim, such as expert evidence, to prevent a court from granting

-22-

Case No. 5:07-cv-579
Gwin, J.

summary judgment in favor of the defendant. *See, e.g., Knief v. Minnich*, 103 Ohio App. 3d 103, 108 (Logan Cty. 1995).

This Court must determine whether an alleged injury is sufficiently serious and whether defendant's alleged conduct was sufficiently extreme and outrageous for the claim to go forward. *Popson v. Danbury Local School Dist.*, 2005 WL 1126732, *12 (N.D. Ohio, April 28, 2005); *Kovac v. Lowe's Home Centers, Inc.*, 2006 WL 1644336, *9 (N.D. Ohio, June 7, 2006.)

The Court finds that neither Plaintiff has established a sufficiently serious injury that was proximately caused by any of the Defendants. Plaintiffs' more serious injuries occurred before the outrageous conduct occurred, and their injuries from after the outrageous conduct were not sufficiently serious and debilitating. For these reasons, Defendants are entitled to summary judgment on both Plaintiffs' intentional infliction of emotional distress claims.

*A. Plaintiff Graves' Claims*

1. Depression

Plaintiff Graves alleges she had emotional problems, the cause of which she could not pinpoint. [Graves Depo p. 94]. The problems began in August, September, or October. [*Id.*] She was prescribed Zoloft. [*Id.*] She also testified she suffered sleeplessness and nervousness. [*Id.*] Typically, sleeplessness and nervousness are not severe and debilitating. *Morris v. State of Ohio*, 2002 WL 31429811, *10 (Cuyahoga Cty. October 31, 2002).

Depression can be a symptom of serious emotional distress. *Paugh*, 6 Ohio St. 3d at 78. Graves, however, attributed her depression to more than one source – including post-partum depression, that the bank was foreclosing on her home, and the phone calls. [Graves Dep. p 95]. Plaintiff Graves took the Zoloft for approximately two months. [*Id.*]

-23-

Case No. 5:07-cv-579
Gwin, J.

Defendant Triad argues that its actions were not the proximate cause of Plaintiff Graves depression. The Court agrees. Graves's claim "must be based on identifiable actions of particular defendants, not a generally stressful situation." *Kovacic v. City of Eastlake*, 2005-L-205, 2006 Ohio App. LEXIS 6966 (Lake Cty Dec. 29, 2006). Graves testified her depression was the result of "a combination of things" and that "[she] can't attribute all to – all the phone calls from Triad to this, but it was a combination of everything." [Graves Dep. p. 94-95]. Based on Graves' testimony, the Court finds that Graves does not sufficiently show that Defendant Triad caused her depression.

As Graves' depression occurred before Defendants Brombacker & Williams and Shell became involved in this case, they did not proximately cause her depression. *See Johnson v. Lakewood Hosp.*, NO. 70943/71257 1997 Ohio App. LEXIS 4016 (Cuyahoga Cty. Sept. 4, 1997) *citing Dickerson v. International UAW Union*, 98 Ohio App. 3d 171 (Cuyahoga Cty. 1994).

2. Psychic Injury in 2007

Graves also claims she left her job in January of 2007 and could not sleep due to the outrageous conduct. [Graves Dep. 10]. Graves testified, however, she also left her job because of her hours and she found another job shortly thereafter. [*Id.*]. In *Thibodeaux v. B E & K Constr. Co.*, the court found where a plaintiff testified that the stress of the alleged outrageous conduct made her so physically ill she could not perform her job, and that she quit two weeks after the conduct but found a job one month later, and where she sought medical treatment after the allegedly outrageous conduct but could not recall whether the doctor had prescribed anti-depressants, the plaintiff failed to prove her injury was sufficiently serious and also failed to show that her depressed condition proximately resulted from Defendants' conduct. See *Lasley v. Nguyen*, --- N.E.2d ----, 2007 WL 2285130, ¶ 20 (Ohio App. 2007)(where plaintiff had previous medical history of neck and back

-24-

Case No. 5:07-cv-579
Gwin, J.

injuries, the plaintiff needed expert testimony to establish the injury related to the accident.)

The Court finds this case similar to *Thibodeaux*.  The plaintiff here also found another job shortly after quitting her job; she also had sleepless nights, such that she needed the benefit of Tylenol PM. She did not find the conduct so debilitating that she missed work. *Accord Rice v. Cuyahoga County DOJ*, NO. 85576, 2005 Ohio App. LEXIS 4848 (Cuyahoga Cty. Oct. 6, 2005) (difficulty sleeping, taking a five week medical leave, but continuing work after that not sufficiently serious); *Brooks v. Lady Foot Locker,* No. 22297, 2005 Ohio App. LEXIS 2281 (Summit Cty. May 18, 2005) (migraines that did not interfere with daily activities not sufficiently serious).  For these reasons, the Court finds Plaintiff Graves has not demonstrated facts to support a finding that she suffered mental anguish that was sufficiently serious and of a nature that "no reasonable man could be expected to endure it."  Additionally, the Court finds that Plaintiff fails to offer needed expert evidence to establish that any depressed condition resulted from Defendants acts, as opposed to other factors that earlier led to prior depression symptoms.

As stated above, the alleged outrageous conduct is not shown to be the proximate cause of Plaintiff Graves depression.  Defendants Brombacker & Williams and Shell did not have any contact with Plaintiff Graves before she began taking Zoloft.  Plaintiff Graves does not allege she suffered any "severe and debilitating" psychic injury beyond her depression.  Because Plaintiff Graves does not show sufficient evidence to establish that Defendant Triad proximately caused Graves' depression, and because Defendants Brombacker & Williams and Shell could not have caused her psychic injury, the Court finds summary judgment appropriate.  The Court, therefore, grants summary judgment to all defendants on Graves' intentional infliction of emotional distress claim.

*B. Plaintiff Campbell's claims*

-25-

Case No. 5:07-cv-579
Gwin, J.

1. Hospitalization

Plaintiff Campbell was hospitalized on September 18, 2006 for three days [Campbell Dep. 135].  She claims this resulted from the emotional distress Defendants inflicted on her. Defendants Brombacker & Williams and Shell had no contact with Plaintiff Campbell until January. [Brombacker Aff.].  The Court therefore considers the argument in connection with Plaintiff's hospitalization only in terms of Defendant Triad's motion.

Plaintiff Campbell fails to provide adequate evidence to ~~prove~~ raise a factual issue that Defendant Triad's conduct was the cause of her hospitalization.  In Ohio, a plaintiff claiming a severe and debilitating injury must present a guarantee of genuineness in support of this claim, such as expert evidence. *Knief v. Minnich*, 103 Ohio App.3d 103 (1995). Alternatively, a plaintiff may submit the testimony of lay witnesses acquainted with the plaintiff who have observed significant changes in the emotional or habitual makeup of the plaintiff. *Uebelacker v. Cincorn Systems, Inc.*, 48 Ohio App.3d 268, 276 (1988).  In this case, plaintiff does neither.  As such, she does not show sufficient support for her claim that defendants' acts related to her hospitalization.  The Court, therefore grants summary judgment to Defendants on this part of the claim.

2. Conduct After Hospitalization

With regard to Triad's conduct that allegedly occurred after Campbell's hospitalization, the Court does not find Plaintiff Campbell's injuries were "severe and debilitating."

Plaintiff Campbell alleges she was unable to sleep due to anxiety, and she took Celexa, Ambien, and Lexapro for her anxiety and emotional distress. [Campbell Dep. 144, 210].  Plaintiff Campbell, however, continued to work.  In *Rice v. Cuyahoga County DOJ*, the Plaintiff could not establish a sufficiently serious injury where he saw a psychologist due to anxiety at work, was

Case No. 5:07-cv-579
Gwin, J.

depressed, had chest pains and knots in his stomach, had difficulty sleeping, took a five week medical leave, was very moody, but continued to work.  NO. 85576, 2005 Ohio App. LEXIS 4848 (Cuyahoga Cty. Oct. 6, 2005).  That court noted Rice's continuing employment indicates that his emotional distress was not severe and debilitating. *Id. citing Ridley v. Fed. Express*, NO. 82904, 2004 Ohio App. LEXIS 2261 (Cuyahoga Cty. May 20, 2004); *Garcia v. ANR Freight Sys., Inc.*, 942 F.Supp. 351, 359-360 (N.D. Ohio, 1996).

The Court finds that since Plaintiff Campbell has not shown she has had difficulty continuing her employment.  She also fails to offer any expert testimony supporting her claim that any anxiety resulted from Defendant Triad's conduct.  Finally, Campbell does not show that any mental anguish that she suffered was of a nature that "no reasonable man could be expected to endure it."

**Count VI: Invasion of Privacy**

"Liability [for invasion of privacy] may be predicated on an unreasonable intrusion upon the other's right to seclusion, misappropriation of another's name or likeness, unreasonable publicity given to another's private affairs, or liability under a false light theory." *Halter v. Phillips*, 69 Ohio App.3d 574, 578 (1990). The Plaintiff alleges that Defendants' conduct here falls into three categories: the unreasonable intrusion into their private affairs, public disclosure of embarrassing private facts, and false light. [Doc. 44].

The Court finds that Plaintiffs have failed to show "publicity", a necessary element for both the publication of private facts and false light claims.   Plaintiffs have shown a genuine issue of material fact, however, on their intrusion into seclusion claims as against both defendants.

*A. Intrusion onto Seclusion*

The tort of unreasonable intrusion into one's private affairs requires "[o]ne who intentionally

Case No. 5:07-cv-579
Gwin, J.

intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to the liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person." *Sustin v. Fee*, 69 Ohio St.2d 143, 145 (1982). Under Ohio law, one is subject to liability for intrusion upon seclusion "only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." *York v. General Elec., Co.*, 144 Ohio App. 3d 191 (Butler Cty. 2001). The intrusion tort is "akin to trespass in that it involves intrusion or prying into the plaintiff's private affairs." *Killilea v. Sears, Roebuck & Co.* 27 Ohio App. 3d 163, 166 (1985).

Creditors have "a right to take reasonable action to pursue his debtor and persuade payment." *Housh v. Peth*, 165 Ohio St. 35 (1956), ¶ 3 of the syllabus. Extreme conduct by a creditor could be actionable where the creditor's conduct would "outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." *Id.* at ¶ 2 of the syllabus. To make out a claim for unreasonable intrusion into one's private affairs, the creditor must have mounted "a campaign to harass and torment the debtor." *Id.*

1. Defendant Triad

If Plaintiffs' evidence is believed, Plaintiffs received persistent phone calls initiated by Triad, Triad and B&W continued those calls after the receipt of a cease and desist letter, a Triad representative called Plaintiff Campbell regarding "fraud" stating he was at the local sheriffs' office, and a Triad representative also called both Plaintiffs' relatives and co-workers.

In a case where Ohio recognized intrusion onto seclusion of one's private affairs, a debt collector repeatedly called the plaintiff at her home and at her work, informed her supervisor and landlord of the debt, causing the plaintiff's employer to threaten termination of her employment if

-28-

Case No. 5:07-cv-579
Gwin, J.

the calls did not stop and a roomer in her boarding house to leave to escape the annoying phone calls. *Housh*, 165 Ohio St. at 41.   In another case recognizing a claim, a creditor called debtor between forty and fifty times, asked if debtor was related to Rodney King, used foul language, called debtor's sister and friend at least twice informing them that a warrant had been issued for debtor's arrest, called debtor's landlord, and sent debtor's employer letters and faxes about the debt. *King v. Cashland*, 2000 Ohio App. LEXIS 3943, 99-1640 (Montgomery Cty Sept. 1, 2000). In both of these cases the creditor called people other than plaintiffs and informed them of the debt, the persistent phone calls were also of a different magnitude than those committed here.

Both plaintiffs offer evidence that Defendant Triad similarly called them multiple times, as well as calling their relatives and co-workers.  While most of the evidence seems to point to Defendant Bromacker & Williams and Shell making such calls, Plaintiffs do cite evidence that Defendant Triad made some of the calls.  As such, the Court denies Defendant's Triad motion for summary judgment on the intrusion into seclusion claim.

2. Defendants Brombacker & Williams and Shell

Plaintiff Graves alleges that Defendants Brombacker & Williams and Shell called many times a day, even after receiving cease and desist letters, that Shell called her pretending to activate a credit card to get information, that Shell called Graves' work's emergency line, tying up the phones, that Shell contacted Graves' aunt (Campbell's sister) and stated that Campbell and Graves had committed fraud and concealment regarding the car.  Defendant Shell also allegedly called Graves' grandmother and stated she would have both Campbell and Graves jailed for fraud and concealment.         Plaintiff Campbell also alleges that Defendant Shell called her work and left a message regarding fraud and concealment, that "the calls would start in the afternoon and would

-29-

Case No. 5:07-cv-579
Gwin, J.

not stop" [Meadows Dep. 7].  On February 6, 2007, Defendant Shell called Campbell at 11:15 am,

11:18 am, 11:19 am, 11:20 am, 11:21 am, 11:22 am, 2:22 pm, and 2:23 pm. [Campbell Dep. 89].

The Court construes all facts in the light most favorable to Plaintiffs.

Both Plaintiffs have shown facts that could support a jury finding Defendants had intruded

onto their seclusion.  The sheer number of calls, coupled with the accusations that Plaintiffs were

involved in a "fraud" could intrude onto their private affairs and could be highly offensive to a

reasonable person.  *See Housh*, 165 Ohio St. at 41; *King*, 2000 Ohio App. LEXIS 3943.  For this

reason, the court denies Defendants Brombacker & Williams and Shell's motion for summary

judgment on the intrusion into seclusion claim.

*B. Publication of Private Facts*

To establish a claim for invasion of privacy by publication of private facts, plaintiffs must

prove five elements:

> (1) There must be publicity; the disclosure of a public nature, not private. 'Publicity' means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person.
> (2) The facts disclosed must be those concerning the private life of an individual, not his public life. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public, such as matters of public record about his birth or marriage date, or matters that the plaintiff leaves open to the public eye, such as kissing his spouse in public.
> (3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.
> (4) The publication must have been made intentionally, not negligently.
> (5) The matter publicized must not be a legitimate concern to the public. A newspaper's publicizing 'legitimate news' ordinarily will not be actionable.

*Killilea v. Sears, Roebuck & Co.*, 27 Ohio App. 3d 163, 166-167 (1985).

Case No. 5:07-cv-579
Gwin, J.

1. Defendant Triad

Plaintiffs cannot prevail on a claim for invasion of privacy by publication of private facts against Defendant Triad.  For a valid invasion of privacy claim, the Plaintiffs must show publicity *Early v. The Toledo Blade*, 130 Ohio App.3d 302, 342. Plaintiffs allege that Defendant Brombacker & Williams and Shell publicized the private facts.  While Plaintiffs allege that Triad called their relatives and co-workers, they do not state Triad disclosed any private facts to them.  Rexroad, an employee of Triad, admits to calling Graves' grandmother but denies stating he called about a debt. [Rexroad Aff.] Plaintiffs have not pointed to any evidence in the record that demonstrates that Triad disclosed private facts.

Further, Plaintiffs must prove publicity.  *Early,*130 Ohio App.3d at 342. "'Publicity' means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person." *Id.*   Plaintiffs have not alleged that Defendant Triad communicated private facts to anyone, let alone enough people to cause a matter to become public knowledge.  For these reasons, the claim of publication of private facts cannot survive summary judgment against Triad.

2. Defendants Brombacker & Williams and Shell

Plaintiffs cannot prevail on their claim of publication of private facts against Defendants Brombacker & Williams and Shell because Plaintiffs cannot prove publicity. Plaintiffs allege that Defendants communicated to three people (Plaintiff Campbell's mother, sister, and her co-worker) that Plaintiffs had committed"fraud and concealment."  Communicating to three people individually

-31-

Case No. 5:07-cv-579
Gwin, J.

is not enough for the matter to be regarded as "substantially certain to become one of public knowledge." *Early*, 130 Ohio App.3d at 342.

*C. False Light*

"In Ohio, one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 473 (2007).

1. Defendant Triad

The Plaintiffs' claim for false light claim fails against Triad. Plaintiffs allege that Defendant Shell informed third parties that the Plaintiffs engaged in concealment and fraud, not Triad. Triad is not liable for actions of independent contractors under Ohio law. *See Pusey v. Bator*, 94 Ohio St. 3d 275 (2002). Further, Campbell alleges that a Mr. Snow from Triad contacted her, claiming to be from the Summit County Sheriff's Office, and accused Campbell of fraud. Triad denies that it ever employed any person named Snow in any relation to Plaintiffs. Plaintiff Campbell does not allege that Snow gave publicity to this matter. No evidence supports any connection between Snow and Triad. The conversation occurred between Plaintiff Campbell and Snow only. Accordingly, the Court grants summary judgment to Defendant Triad in this claim.

2. Defendants Brombacker & Williams and Shell

As discussed above, Plaintiffs have failed to show that Defendants Brombacker & Williams and Shell "publicized" a matter. To claim false light, Plaintiffs must show that Defendants "[gave]

-32-

Case No. 5:07-cv-579
Gwin, J.

publicity to a matter concerning another that places the other before the public in a false light."

*Welling*, 113 Ohio St. 3d at 473.  Plaintiffs have failed to do this.

### Count VII: Willful and Wanton Breach of an Implied Contract Term

The Court finds that Defendant Triad did not breach any terms of the contract, and that Defendants Brombacker & Williams and Shell do not have a contract with Plaintiffs, nor are Plaintiffs a third-party beneficiary of a contract between the Defendants.  As such, the Court grants summary judgment to Defendants on the claim for Willful and Wanton Breach of an Implied Contract Term.

*A. Defendant Triad*

Plaintiffs allege that Defendant Triad breached their contract with Plaintiffs.  Defendant Triad agreed to comply with the laws of Ohio in Sections 3(c), 3(d), and 6 of their contract with Plaintiffs.  Sections 3(c) and 3(d) deal with repossession, which is not at issue in the case at bar.  Further, Section 6 merely confirms that "federal law and the law of [Ohio] apply to the [Installment Contract]." [Complaint, Ex. 1.].  This would have been the case regardless.  Plaintiffs argue that Defendant Triad failed to comply with Federal and Ohio law in their other causes of action, and that these failures constitute a willful wanton breach of contract.  The Court does not find the choice of law provision creates any substantive duties under the contract.  Even if it did, the Court has already found the law that Plaintiff cites does not apply to Defendant Triad.

*B. Defendants Bromacker & Williams and Shell*

Defendants Bromacker & Williams and Shell are entitled to summary judgment because there exists no contract between them and Plaintiffs.  Plaintiffs allege that they are third party beneficiaries of the Locator/Repossession Services Agreement.  That contract directed Brombacker

-33-

Case No. 5:07-cv-579
Gwin, J.

& Williams to locate vehicles, such as Plaintiffs' Vehicle, for Triad.  In order to be a third-party

beneficiary, the contract must have been entered into "directly or primarily" for the benefit of that

person. *Heskett v. Van Horn Title Agency, Inc.*, 2006 WL 3775862, at *3 (Franklin App., Dec. 26,

2006); *Sony Electronics v. Grass Valley Group*,  2002 WL 440749, at *3 (Hamilton App., March

22, 2002).   The Court does not find an agreement to locate Plaintiffs' car for the purpose of

repossessing it was "directly or primarily" for the benefit of them.  If anything, it was for their

detriment.  Defendants are therefore entitled to summary judgment on the breach of contract claim.

**Count VIII: Defamation**

To successfully claim defamation, Plaintiffs must show: "(1) assertion of a false statement;

(2) the false statement must be defamatory; (3) the false statement was published by the defendant;

(4) the publication was the proximate cause of an injury to the plaintiff; and (5) the defendant

possessed the required degree of fault." *Celebrezze v. Dayton Newspapers, Inc.*, 41 Ohio App.3d

343, 346-347 (1988).  "Falsity is an essential element to a [defamation] action; therefore, a true

statement cannot provide the basis for such an action." *Natl. Medic Services Corp. v. E.W. Scripps

Co.*, 61 Ohio App.3d 752, 755 (1989).

Defamation falls into two categories, defamation *per quod* or *per se*. *McCartney v. Oblates

of St. Francis deSales*, 80 Ohio App.3d 345, 353 (1992). In defamation *per quod*, a publication is

merely capable of being interpreted as defamatory, and the plaintiff must allege and prove damages.

*Dodley v. Budget Car Sales, Inc*., 1999 Ohio App. LEXIS 1790  (Franklin Cty. Apr. 20, 1999).  If

a publication consists of "(1) written statements which falsely charge the plaintiff with the

commission of a crime, or (2) oral declarations which falsely charge the plaintiff with the

commission of a crime involving moral turpitude which subjects the offender to infamous

-34-

Case No. 5:07-cv-579
Gwin, J.

punishment," it is actionable per se and the plaintiff need not show special harm; instead, damages

are presumed. *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 81 Ohio App. 3d 591 (Summit

Cty. 1992). The determination of whether a statement is slander *per se* or slander *per quod* is a

question of law for the trial court. *Id.*

The Court finds that neither Plaintiff has shown that Defendant Triad made a defamatory

publication to a third party, as such, the Court grants summary judgment to Defendant Triad on the

defamation claim.  The Plaintiffs have, however, shown that Defendants Brombacker & Williams

and Shell have made defamatory statements to third parties.  As such, the Plaintiffs defamation

claims against Defendants Brombacker & Williams and Shell are appropriate for trial.

*A. Defendant Triad*

1. Plaintiff Graves

Plaintiff Graves does not allege that Defendant Triad made any defamatory publication to

a third party.  Plaintiffs allege Defendant Triad called their family members but do not put forth

evidence of the substance of those calls. [Raposo Aff. Ex. 1].  As such, Plaintiff Graves claim for

defamation against Defendant Triad must fail. *See Celebrezze*, 41 Ohio App. 3d at 346.

Plaintiff Graves claims that Rexroad called her "despicable" and said "it was a shame to see

a daughter do that to her mother."  Even if this publication had been made to a third party, it is an

opinion.  The Ohio Constitution Article 1, Section 11 protects opinions from defamation claims.

*Wampler v. Higgins*, 93 Ohio St. 3d. 111, 117 (2001). In determining whether a statement is an

opinion, Ohio courts use a totality of the circumstances test.  *Id.*  It looks to factors such as the

specific language at issue; whether the statement is verifiable; the general context of the statement;

and the broader context in which the statement appeared.  *Id.  Wampler* described calling somebody

Case No. 5:07-cv-579
Gwin, J.

"despicable" as a "paradigmatic statement of opinion." *Id.* at 126.   The statement that it was a

shame to see her do that to her mother was, similarly, an opinion.   Thus, these alleged statements

are not defamatory.

2. Plaintiff Campbell

Plaintiff Campbell claims that Snow, allegedly an employee of Triad, called her on the phone

claiming to be from Triad and stating that he was at the Summit County Sheriff's Office.   According

to Campbell, Snow stated that she had committed a fraud with the Vehicle. (Campbell Dep., 50-51.)

Defendant Triad denies that a Snow worked for them. [Rexroad Aff., Miller Aff., Salaam Aff.] Apart

from her own unsupported testimony, Campbell shows no evidence that any Snow worked for Triad

on her case.   She bears the burden of establishing some connection with Triad and she fails to sustain

this burden.

Regardless, Plaintiff Campbell has not stated defamation claim.   Plaintiff Campbell does not

allege that Snow said anything to anyone besides her.   Without publication to a third person, this

claim cannot proceed. *City of Stow*, 96 Ohio App.3d at 73. Plaintiff Campbell alleges no other

defamatory statements attributable to Defendant Triad.

*B. Defendants Brombacker & Williams and Shell*

1. Statement about Graves and Campbell to Cook-Jordan

Defendants Brombacker & Williams and Shell called Plaintiff Graves' aunt, Cook-Jordan.

Cook-Jordan testified about the call:

> Q.     Do you remember anything about that first phone call?
>
> A.     Yes.  I remember her just stating – because I can't even remember how the
>          phone call went, you know, like how I first got on, how she even got my
>          name or number or anything of that nature.  But I do remember her stating

-36-

Case No. 5:07-cv-579
Gwin, J.

> that my sister and my niece, she was calling for fraud and concealment of a
> car, of an automobile.  And see, I didn't even talk to her.

    Q.    During the first phone call, did you ask her anything more about what she
was saying?

    A.    No.  I told her I didn't know what she was talking about.

[Cook-Jordan Dep. 6-7].  Defendants assert that Shell did not use the word fraud.  The Court examines the evidence in the light most favorable to the Plaintiffs.

Regarding any use of the term concealment, the Court does not find that defamatory.  First, the Plaintiffs do not show any Ohio or Federal crime of concealment.  As to the alleged accusation of fraud such a statement could constitute defamation *per se*. *See Shepard v. Griffin Servs.,* No. 19032, 2002 Ohio App. LEXIS 2298 (Montgomery Cty. May 10, 2002) ("Accusations of fraud and deceit indicate that she committed crimes of moral turpitude.")  Under Ohio law, "Defraud" means to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another."  Ohio Rev. Code § 2913.01(B).  Depending upon the value involved, Defrauding creditors can be a felony supporting a claim of defamation per se.  O.R.C. § 2913.45.  Thus, the statements could be defamatory as a 'fraud.'  Defendants do not dispute that this was a publication to a third party.

Defendants assert that the statements were substantially true, and therefore Plaintiffs are not entitled to recover.  *E.W. Scripps*, 61 Ohio App. 3d at 755 ("'It is sufficient [in defending against a defamation action] to show that the imputation is substantially true, or as it is often put, to justify the "gist," the "sting," or the substantial truth of the defamation.' ") quoting Prosser, Law of Torts (4 Ed.1971), 798-799) .  Plaintiffs allege that they told Defendant Triad where the car was located.  But Defendant show uncontested testimony that both Triad and Shell asked Graves numerous times

Case No. 5:07-cv-579
Gwin, J.

for the Impala's location.  Graves  refused to provide the location.  Any statement by Shell that Graves concealed the Impala were substantially true.  Plaintiffs defamation claim regarding the description of them as concealing the location of the Impala fails.

Defendants do not deny that Brombacker & Williams employee Shell used the word fraud in speaking with Graves' aunt, Cook-Jordan.  Because Defendants may have accused Plaintiffs of committing fraud, there remains a genuine issue of material fact as to whether the statements to Cook-Jordan constituted defamation *per se*.

Defendants further argue that the statements could be innocently construed, thus saving them from liability. *Krems v. University Hospital of Cleveland*, 133 Ohio App. 3d 6 (Cuyahoga Cty. 1999).  Defendants fail to describe what innocent construction could be given the description of Plaintiffs as committing a fraud.  As such, the Court does not find the statement subject to that savings rule.

The statement cannot be construed as an opinion.  To determine whether the statement was an opinion under *Wampler*, the Court considers the specific language at issue; whether the statement is verifiable; the general context of the statement; and the broader context in which the statement appeared. *Wampler*, 93 Ohio St. 3d at 117.  In this case, the specific language is unclear.  From the context and the fact that the statement was readily verifiable, however, the Court finds the statement was not an opinion. Had Plaintiffs engaged in fraud or concealed something, it would be verifiable. The fact that Defendants are arguing truth regarding the concealment statement suggests that they will attempt to verify it.

2.  Statements about Plaintiffs Campbell and Graves to Webster

Plaintiffs show evidence that Defendant Shell called Campbell's mother, Katie Webster, and

-38-

Case No. 5:07-cv-579
Gwin, J.

accused Campbell and Graves of fraud and stated that she would have them put in jail. [Webster Dep. 5, 7]. As discussed above, this could be defamation *per se*.  As such, there is a genuine issue of material fact, and the Court denies the Defendants' motion for summary judgment.

3. Statements About Plaintiff Campbell to Meadows

Plaintiffs also say that Defendants made statements to Meadows, a co-worker of Plaintiff Campbell, that implied that Plaintiff Campbell was involved in fraud and concealment. [Meadows Dep. 8-9, 20].  As this statement was not published about Plaintiff Graves, the Court grants summary judgment to Defendants as to Graves' defamation claim regarding the statement to Meadows.  As discussed above, this evidence raises a genuine issue of material fact such that Plaintiff Campbell's defamation claim about the statement defendants made to Meadows must proceed to trial.

*III.  Plaintiffs' Counterclaims*

The Court finds the Defendant Triad has shown genuine issues of material fact on its breach of contract counter-claim but the repossession claim is moot.

**Breach of Contract**

A contract is a promise or a set of promises that the law will enforce either by remedying a breach or recognizing a duty. *Ford v. Tandy Transp. Inc.*, 86 Ohio App.3d 364, 380 (1993).  Proof of the existence of a contract requires: (1) an offer, (2) an acceptance, (3) a meeting of the minds or agreement, (4) an exchange of consideration, and (5) certainty as to the essential terms of the contract. *Nilavar v. Osborn*, 137 Ohio App.3d 469 (2000).

To show a breach of contract, counter-claim plaintiff must demonstrate: (1) the terms of the contract, (2) performance by the counter-claim plaintiff of its obligations, (3) the breach by the counter-claim defendant, (4) damages, and (5) consideration. *American Sales, Inc. v. Boffo*, 593

-39-

Case No. 5:07-cv-579
Gwin, J.

N.E.2d 316, 321 (Ohio App.1991).

Counter-claim Plaintiffs have done so here.  Plaintiff Campbell signed the contract as a co-buyer.  She says she intended to sign as a guarantor, but the contract she signed clearly described her as a co-buyer and stated she would be liable for all of the debt in clear language directly below where she signed. [Doc 1, Ex. 1].  Campbell does not allege fraud or duress.  Campbell signed the Defendant's proposed offer.  A meeting of the minds is most often shown by a signed offer and acceptance. *Cuyahoga Cty. Hospitals v. Price*, 64 Ohio App.3d 410, 416 (1989).  A meeting of the minds existed.

Plaintiffs also argue that Defendants violated the Fair Debt Collection Practices Act.  Plaintiffs do not explain how this alleged violation has any bearing on the breach of contract counter-claim.  The Court decides it does not.

**Repossession**

Defendants have repossessed the car at issue.  Defendants therefore acknowledge this claim is moot. [Doc. 142]  As such, the Court dismisses it.


**IV.  Conclusion**

In conclusion, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' and Plaintiffs' Motions for Summary Judgment, and **GRANTS** Plaintiffs' motion to file an amended

Case No. 5:07-cv-579
Gwin, J.

complaint.

       IT IS SO ORDERED.


Dated: October 9, 2007                         s/_____*James S. Gwin*_____
                                               JAMES S. GWIN
                                               UNITED STATES DISTRICT JUDGE